Daryl Rose Coppins, Personal Representative
of the Estate of Alyce Armstrong,
Plaintiff-Appellant,†

Bank of America, N.A., Involuntary-Plaintiff,

v.

Allstate Indemnity Company,
Defendant-Respondent.

Court of Appeals

*No. 2013AP2739. Submitted on briefs July 31, 2014.
—Decided November 12, 2014.*

2014 WI App 125

(Also reported in 857 N.W.2d 896.)

† Petition for Review Filed.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael P. Konz* and *Erik L. Fuehrer* of *Gabert, Williams, Konz & Lawrynk, LLP*, of Appleton.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Robert C. Burrell, Barbara A. O'Brien* and *Patryk Silver* of *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Daryl Rose Coppins, as the personal representative of the estate of her deceased mother, Alyce Armstrong, appeals the order granting summary judgment to Allstate Indemnity Company on her claims for breach of contract, promissory estoppel, and bad faith. The trial court granted Allstate's motion for summary judgment on the basis that Allstate discharged its duties under the policy it issued for Armstrong's property by paying Coppins the property's "actual cash value" as determined by a third-party appraiser after the property was destroyed by a fire. On appeal, Coppins argues that summary judgment is improper because: (1) the appraiser's award, on its face, evinces a lack of understanding regarding how to properly calculate "actual cash value" and must consequently be set aside; and (2) there are issues of fact concerning whether Allstate breached the policy and acted in bad faith when it repeatedly insisted on paying damages solely based on the property's "market value" when the property was insured on an "actual cash value" basis. We agree with Coppins, and therefore reverse the trial court's order and remand for further proceedings consistent with this opinion.

### BACKGROUND

¶ 2. This case involves a residential duplex that was destroyed by a fire. On July 21, 2011, a fire occurred at 3024–3026 North Second Street in Milwau-

183

kee, causing substantial property damage that rendered the duplex uninhabitable and forced the tenants to move out.[1]

### A. The property is insured on an "actual cash value" basis.

¶ 3.   At all times material here, the property was insured by Allstate via a landlord's policy providing "up to $298,358" of dwelling protection coverage at "actual cash value." The policy contained a great deal of detail about the construction of the home, including but not limited to the:   general condition of the home ("good"), square footage of the living space, nature of the foundation, materials used in the construction of the walls, roofing, siding, and partitions, and nature of the heating and cooling systems. The policy also included a ten-percent code upgrade endorsement, under which an additional ten percent of coverage was available if a loss occurred and additional repair was required to bring the building up to current code. In 2011, the yearly premium for the policy was $2112.08.

¶ 4.   While the Allstate policy did not define "actual cash value,"[2] it did provide some clues as to how "actual cash value" would be calculated in the event of a covered loss. For example, in referencing "actual cash value," the policy contains an "important notice," stating in bold type that, "Your property is covered on an actual cash value basis," and further explaining:

---

[1] The action at issue here was brought by Coppins as the personal representative of the estate of her deceased mother, Alyce Armstrong. Armstrong owned the property in question and died shortly before a fire destroyed the property.

[2] This fact is undisputed by the parties.

We'd like to remind you that your policy provides actual cash value coverage. So if you experience a covered loss, we will pay for a loss to your covered property on an actual cash value basis, meaning there may be a deduction for depreciation.

Your Coverage A – Dwelling Protection limits shown on your Policy Declarations reflect the estimated actual cash value for your property when it was originally written, or the amount most recently selected by you. This estimate was based on data that was available to us at the time we made the estimate, including the dwelling style, construction, additions and other details. Keep in mind, however, the actual amount it will cost to repair or replace your property cannot be known until after a covered total loss has occurred.

¶ 5.   In addition, an endorsement titled "Landlords Package Policy—Actual Cash Value Loss Settlement Endorsement" explains how Allstate pays for a loss:

Loss to property insured by this policy . . . will be settled on an actual cash value basis. This means there may be a deduction for depreciation. Payment will not exceed the smallest of:

a)   the actual cash value of the damaged, destroyed or stolen property at the time of loss;

b)   the amount necessary to repair or replace the damaged, destroyed or stolen property with other of like kind or quality; or

c)   the limit of liability applicable to the damaged, destroyed or stolen property.

185

*B.   Standard definitions of "actual cash value" define it as "replacement value minus depreciation," and do not include a property's "market value."*

¶ 6.   Moreover, the Allstate website—which we take judicial notice of pursuant to WIS. STAT. § 902.01 (2011–12),[3] *see also Turnpaugh v. State Claims Bd.*, 2012 WI App 72, ¶ 5 n.2, 342 Wis. 2d 182, 816 N.W.2d 920—defines "actual cash value" as follows:

> In many states, [actual cash value] means that, in the event of a covered loss, you'll be paid the current replacement cost of what you lost, minus depreciation. (This generally includes the estimated wear and tear on the item damaged or the loss in value of that item because of aging and use.)
>
> The total amount you'd be paid would be subject to the terms of your particular policy, including applicable deductible and coverage limits.[4]

¶ 7.   In addition, we note—pursuant to WIS. STAT. § 902.01 and *Bethke v. Auto-Owners Ins. Co.*, 2013 WI 16, ¶ 36 n.13, 345 Wis. 2d 533, 825 N.W.2d 482—that the Wisconsin Office of the Commissioner of Insurance defines "actual cash value" as: "[t]he value of the property when it is damaged or destroyed. This is usually figured by taking the replacement cost and subtracting depreciation."[5]

¶ 8.   We also note that the Office of the Commissioner of Insurance website very clearly explains that "actual cash value" is calculated on a very different basis

---

[3] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

[4] *See* http://www.allstate.com/tools-and-resources/home-insurance/terms.aspx (last visited October 27, 2014).

[5] *See* http://oci.wi.gov/glossary/glossary-a.htm (last visited October 27, 2014).

186

than "market value." The Office of the Commissioner of Insurance defines "market value" as follows:

> A real estate term that describes what the current value of your home would be if you were to sell it—including the price of the land. *This amount generally is not involved in determining what amount to purchase under a homeowner's policy. Since the object of most property insurance policies is to pay the insured the actual cash value or the cost to repair or replace the damaged or destroyed property, the "market" or "book" values are not used in loss settlements.*[6]

(Emphasis added.)

¶ 9. Similarly, BLACK'S LAW DICTIONARY 43, 1784 (10th ed. 2014), defines "actual cash value" for insurance purposes as "[r]eplacement cost minus normal depreciation."[7] *See American Mut. Liab. Ins. Co. v. Fisher*, 58 Wis. 2d 299, 303, 206 N.W.2d 152 (1973) ("This court may take judicial notice of dictionary definitions to determine the common meaning of words."). Likewise, the Wikipedia entry regarding "actual cash value" explains: "Actual Cash Value (ACV) . . . is computed by subtracting depreciation from replacement cost. The depreciation is usually calculated by establishing a

---

[6] *See* http://oci.wi.gov/glossary/glossary-m.htm (last visited October 27, 2014).

[7] BLACK'S LAW DICTIONARY 1784–85 (10th ed. 2014), also defines "actual cash value" as "fair market value," which is the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction"; however, the "market value" definition harkens back to the eighteenth century and is not discussed as applying in an insurance context, whereas the former definition of "actual cash value," "[r]eplacement cost minus normal depreciation," specifically applies to insurance and was first used in 1853. *See id.*

useful life of the item determining what percentage of that life remains . . . ."[8] *See Fisher*, 58 Wis. 2d at 303.

### C. *After the fire, Allstate agrees to provide damages solely based on the property's "market value."*

¶ 10.   Turning back to the events precipitating the suit before us, after the fire, Coppins provided a notice of loss to Allstate, and Allstate claim adjuster Jim Van Caster calculated the actual cash value of the property as $113,000. Van Caster's calculation included approximately $158,000 to replace the fire-damaged items minus depreciation.

¶ 11.   For reasons unknown, Allstate refused to accept Van Caster's computation, and instead hired a real estate market appraiser, Chris Krafcheck, who valued the property at $50,000.[9] Krafcheck did not examine the house for fire damage or calculate how much it would cost Coppins to repair the damage to the property. Indeed, in his appraisal report, Krafcheck repeatedly stressed the limited nature of his appraisal:

> The purpose of the appraisal report is to give an opinion of the current market value of the subject property . . .

---

[8] *See* http://en.wikipedia.org/wiki/Actual_cash_value (last visited October 27, 2014).

[9] The record does not indicate when Van Caster computed the actual cash value of the property, nor are we given any clues as to why Allstate abandoned Van Caster's estimate and decided to hire Krafcheck instead. The fact that "Allstate refused to accept Van Caster's computation" is taken from Coppins' brief, and is a fact that Allstate does not refute. *See Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 108–09, 279 N.W.2d 493 (Ct. App. 1979). We remind the parties that the rules of appellate procedure require factual statements and arguments to be supported by the record. *See* WIS. STAT. RULE 809.19.

just prior to the fire damage dated July 21, 2011. The appraiser has done a limited view of the interior and exterior of the subject property and made an exterior viewing of the comparable sales listed in the report, unless otherwise indicated . . . .

The appraiser's "viewing" is really more of an "observation." It is not to be regarded as a full property inspection of the type intended to reveal defects in mechanical systems, structural integrity, roofing, siding or any other property component . . . . Statements regarding condition of the subject property are assumptions regarding the components of the subject property just prior to the fire damage dated July 21, 2011. These are assumptions that cannot be verified . . . .

¶ 12.   Krafcheck repeatedly noted that the sole purpose of the appraisal was to calculate the "market value" of the structure. For example, in the section concerning the report's intended use, Krafcheck explained:

The intended use [of this report] is to evaluate the property that is the subject of this appraisal for an insurance settlement, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report

form, and Definition of Market Value . . . . *No one . . . should rely on this report to disclose the condition of the property or the presence/absence of any defects.*

(Emphasis added.) "Actual cash value" was not discussed.

¶ 13.   Subsequently, Allstate informed Coppins that it would only pay $50,000 for the fire damage.

189

*D. Coppins sues Allstate on the basis that Allstate did not provide the "actual cash value" coverage for which Coppins paid.*

¶ 14.  Coppins accepted Allstate's $50,000 payment but disputed the amount of the loss. Given the disparity between Van Caster's and Krafcheck's calculations, Coppins "questioned the basis for Allstate's low offer." Allstate, in turn, notified Coppins that it would be exercising its "right to appraisal of the loss pursuant to the insurance contract." That provision of the policy provided:

> If you and we fail to agree on the amount of loss, either party may make written demand for an appraisal. Upon such demand, each party must select a competent and impartial appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire.

> The appraisers shall then determine the amount of loss, stating separately the actual cash value and the amount of loss [for] each item. If the appraisers submit a written report of agreement to you and us, the amount agreed upon shall be the amount of loss. If they cannot agree, they will submit their differences to the umpire. A written award agreed upon by the appraisers or an appraiser and the umpire will determine the amount of loss.

(Emphasis omitted.)

¶ 15.  Pursuant to the appraisal clause, the parties each designated their appraisers. Coppins sought the services of Claim Professional Representatives ("CPR"), through which she designated Dean Rossey as her

190

appraiser. CPR additionally retained Gerald Smith, a public adjuster, who computed the actual cash value of the property as $250,685.20. Smith's thirty-two-page report included a detailed item-by-item assessment of the damaged items within the building, minus a sum to compensate for depreciation. Allstate hired Michael Holzhauer, a real estate appraiser, who adopted Krafcheck's $50,000 market value as the property's "actual cash value."

¶ 16. In November 2011, Coppins objected to Allstate's appointing Holzhauer, arguing that Holzhauer's sole experience was in real estate appraisals, not insurance claims adjustment appraisals. Allstate responded that Holzhauer was "one of the premier real estate appraisers in the Milwaukee County area" and that there was "no requirement that he have experience in adjusting insurance claims."

¶ 17. As the issue remained unresolved several months later, Coppins, in March 2012, filed the instant action against Allstate, alleging breach of contract, promissory estoppel, and bad faith.[10] The crux of Coppins' claims was that Allstate appointed an incompetent appraiser—i.e., one who only had experience calculating "market value" as opposed to "actual cash value"— and deliberately interfered with Allstate's appraiser's impartiality by, among other things, "[i]nsisting that its appraiser restrict the scope of its actual cash value analysis to a market value appraisal." Allstate responded to Coppins' complaint by filing a motion for summary judgment, arguing that Coppins' suit must either be dismissed or stayed pending completion of the appraisal process.

---

[10] The complaint also included a request for declaratory judgment. The parties do not raise any issues related to the request for declaratory judgment on appeal.

¶ 18. In July 2012, the parties agreed to stay litigation pending completion of the appraisal process. Allstate substituted Holzhauer, naming William Hall as its appraiser, and Coppins again selected Rossey. Per the policy's appraisal clause, Hall and Rossey selected Steven Schwed as the umpire.

*E. An appraiser, acting on the premise that there is no "set" formula for calculating "actual cash value" and using numerous figures related to the property's "market value," calculates the property's "actual cash value" at about $74,000.*

¶ 19. Schwed's appraisal award set the actual cash value of the building at $74,198.42, plus $5000 for mold remediation, for a total of $79,298.42. Schwed's report calculated the replacement cost of the dwelling loss at $287,798.76. However, that figure does not appear anywhere in Schwed's calculation of actual cash value. Rather, Schwed computed actual cash value based on the average of five separate determinations, one of which appears to have been weighted less equally than the others for no apparent reason:

- The first figure, $143,159, was "replacement cost less depreciation," which, according to Schwed, was based upon Hall's analysis. The first figure is inexplicably accorded only "90%" weight for a "net amount" of $128,843.10. (Capitalization omitted.)
- The second figure was the building's assessment value, $69,400, and was given "100%" weight.
- The third figure, $66,375, was derived from the "income approach," and was given 100% weight.
- The fourth figure, $57,265, was the "average of adjusted sales price" for five comparable properties, and was given 100% weight.

192

- The fifth figure, $50,000, was the "market value" derived from Krafcheck's report and was given 100% weight.

¶ 20.   Schwed's report did not explain why the replacement loss value totaling over $287,000 was never utilized in his calculation of actual cash value, nor does it explain why the $143,159 figure, "replacement cost less depreciation," was weighted at only ninety percent, while the other figures were weighted at one-hundred percent. Also absent from Schwed's analysis is any discussion concerning the application of the policy's code upgrade endorsement, which, as noted, provided an additional ten percent of coverage to bring an older building up to code. Schwed's report simply stated:

> Wisconsin recognizes the broad evidence rule in the determination of actual cash value. Since the repairs vastly exceeded the value of the property, the broad evidence rule is properly applied in this situation. While there is no "set" formula utilized in the determination of broad evidence, *I have taken into account the elements that I feel best represent the value of the loss location.* I considered points raised by Mr. Rossey, utilized certain elements of Mr. Hall's report, certain elements from [Krafcheck's] report (in fact I increased certain assumptions) and I utilized other elements that were not considered in the original adjustment in my calculation of actual cash value . . . .

(Emphasis added.)

*F.   The parties file cross-motions for summary judgment, and the trial court affirms the appraiser's award.*

¶ 21.   When the appraisal process was complete, Allstate paid Coppins an additional $29,198.42 pursu-

ant to Schwed's report and the parties filed cross-motions for summary judgment. Coppins moved for summary judgment on the grounds that Schwed's appraisal decision was deficient on its face and that Allstate had breached the policy by refusing to pay a valid claim in accordance with the terms of the policy. Allstate filed a cross-motion for summary judgment, arguing that the appraisal award should be binding and that Allstate had discharged its duties.

¶ 22.    The trial court granted summary judgment for Allstate, determining that Coppins' claims must be dismissed because Schwed's appraisal award "show[ed] no indication of fraud, bad faith, or material mistake." Coppins now appeals.

## ANALYSIS

¶ 23.    On appeal, Coppins argues that the trial court erred in granting summary judgment to Allstate on her claims for breach of contract, promissory estoppel, and bad faith. According to Coppins, Allstate's repeated insistence on using the property's market value to calculate the amount owed under the policy when she paid for actual cash value coverage constitutes a breach of contract, and summary judgment is therefore inappropriate. Allstate, on the other hand, claims that Schwed's award should stand because it is presumptively valid and evinces no fraud, bad faith, material mistake, or lack of understanding or completion of the contractually assigned task.[11]

_____

[11] We note that Allstate's fifty-eight-page brief is decidedly lacking in brevity and clarity. For example, the fourth section alone contains thirteen subparts, many of which have arguments that overlap arguments made earlier in the brief. We have attempted to address Allstate's arguments topically, as

## Standard of Review

¶ 24.  "This case involves the construction of an insurance contract, which we review de novo." *See Farmers Auto Ins. Ass'n v. Union Pac. Ry. Co.*, 2009 WI 73, ¶ 30, 319 Wis. 2d 52, 768 N.W.2d 596. "The same rules of construction that govern general contracts are applied to the language in insurance polices." *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. We construe insurance policies "to give effect to the intent of the parties as expressed in the language of the policy." *Id.*

> Therefore, the first issue in construing an insurance policy is to determine whether an ambiguity exists regarding the disputed coverage issue. Insurance policy language is ambiguous "if it is susceptible to more than one reasonable interpretation." If there is no ambiguity in the language of an insurance policy, it is enforced as written, without resort to rules of construction or applicable principles of case law. If there is an ambiguous clause in an insurance policy, we will construe that clause in favor of the insured.

*See id.*, ¶ 13 (citations omitted). "If the language within the [policy] is ambiguous, two further rules are applicable:   (1) evidence extrinsic to the contract itself may be used to determine the parties' intent and (2) ambiguous contracts are interpreted against the drafter." *See Seitzinger v. Community Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426. "It is axiomatic

doing otherwise would undoubtedly result in an unnecessarily lengthy opinion. To the extent we have not specifically addressed an argument, we conclude it is not dispositive. *See State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978).

that we must read insurance policies from the standpoint of a reasonable insured." *Sobieski v. Farmers Ins. Exch.*, 181 Wis. 2d 324, 331, 510 N.W.2d 796 (Ct. App. 1993). However, "[w]e will not interpret a policy 'to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium.' " *See State Farm Mut. Auto. Ins. Co. v. Langridge*, 2004 WI 113, ¶ 15, 275 Wis. 2d 35, 683 N.W.2d 75 (citation omitted).

¶ 25. We also review the trial court's decision to grant summary judgment to Allstate and to confirm Schwed's appraisal award *de novo. See Farmers*, 319 Wis. 2d 52, ¶ 30. "The purpose of the summary judgment procedure is to avoid trials when there is nothing to try." *Tews v. NHI, LLC*, 2010 WI 137, ¶ 42, 330 Wis. 2d 389, 793 N.W.2d 860. Therefore, on summary judgment we do not decide the issue of fact; rather, we decide whether there is a genuine issue of fact. *See id.* We will only grant summary judgment "where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *See id.*; *see also* Wis. Stat. § 802.08(2). We will not grant summary judgment " 'if reasonable, but differing, inferences can be drawn from the undisputed facts.' " *See Tews*, 330 Wis. 2d 389, ¶ 42 (citation omitted).

¶ 26. In addition, determining whether summary judgment was appropriate requires us to review Schwed's appraisal award, which we accord "a more deferential review." *See Farmers*, 319 Wis. 2d 52, ¶ 43. This is because "the appraisal process is a fair and efficient tool for resolving disputes." *Id.* As our supreme court has noted:

First and foremost, the process is fair to both parties. It allows each to appoint an appraiser of their own liking,

with a neutral umpire as the deciding vote. Appraisals also promote finality, are time and cost-efficient, and place a difficult factual question—the replacement value of an item—into the hands of those best-equipped to answer that question. As a form of alternative dispute resolution, the appraisal process is favored and encouraged.

*Id.*

¶ 27.   We limit our review of Schwed's appraisal to the face of the award, and will set it aside only if it shows "fraud, bad faith, a material mistake, or a lack of understanding or completion of the contractually assigned task." *See id.*, ¶¶ 44–45; *see also, e.g., Quinn v. New York Fire Ins. Co.*, 22 Wis. 2d 495, 500–02, 126 N.W.2d 211 (1964) (appraisal award that does not calculate actual cash value when that is the method of calculating damages dictated by the policy is void). We do not second-guess the award or substitute our judgment for that of the appraiser. *See Farmers*, 319 Wis. 2d 52, ¶ 45.

*A.   The appraiser's award must be set aside because, on its face, it evinces a lack of understanding of the contractually assigned task.*

¶ 28.   With the proper standards of review in mind, we turn to Schwed's determination that the actual cash value of the insured property was approximately $74,000. Schwed's report noted that the cost to repair the dwelling exceeded $287,000, yet he completely disregarded this figure in his calculations. Instead, he used the "broad evidence rule" to take into account elements that he felt better described the

property's actual cash value, including the property's assessed value, the average value of comparable properties, and the property's market value—all of which were within the $50,000–$70,000 range. As for the "replacement cost less depreciation" value—a value that Schwed obtained from Allstate's appraiser, Hall—Schwed, for reasons unknown, decided to weight it at "ninety percent" of the total while weighting the aforementioned market value factors at one-hundred percent of their value.

¶ 29. The only conclusion we can draw upon review of Schwed's award on its face is that he did not understand how to calculate "actual cash value." Contrary to what Allstate argues, the fact that the policy does not define "actual cash value" does not mean that the determination is some sort of free-for-all where an appraiser can utilize *any* calculation of his or her choosing based on nothing more than feelings. If that were the case, it would be difficult to understand why any reasonable person would buy insurance. Of course, that is not the law in Wisconsin.

¶ 30. The policy language, the commonly-accepted definitions of "actual cash value" noted above —one of which was provided by Allstate's own website —and our directive to interpret the policy from the standpoint of a reasonable insured, *see Sobieski*, 181 Wis. 2d at 331, all support a conclusion that actual cash value should have been calculated primarily by subtracting depreciation from the cost to replace the damaged materials. For example, the aforementioned policy excerpts, which set the outer limits for actual cash value and which contain not only numerous details about the condition of the various components of the property but also an upgrade endorsement providing additional coverage to bring the building up to code,

198

show that replacement cost is a primary factor for consideration. The above highlighted policy provisions also make clear that depreciation is another figure to be factored into the total. These provisions point to a definition of actual cash value that contemplates replacement cost minus depreciation—not an overwhelming focus on market value. The policy is likewise consistent with commonly accepted definitions of "actual cash value," including the definitions supplied by the Office of the Commissioner of Insurance—which makes extremely clear that market value is *not* synonymous with actual cash value—and Allstate's own website. *See also Appleton Chinese Food Serv., Inc. v. Murken Ins., Inc.*, 185 Wis. 2d 791, 796 n.1, 519 N.W.2d 674 (Ct. App. 1994) (reviewing court may consider definitions of "actual cash value" outside the policy that are relied upon by the parties). While Allstate points to phrases such as "in many states" and "generally" on its website to argue that an appraiser has extremely wide latitude in determining actual cash value, the law requires us to focus on how Coppins would have reasonably interpreted the policy. *See Sobieski*, 181 Wis. 2d at 331. The aforementioned facts, and the fact that Coppins' mother purchased and paid for over $300,000 in insurance coverage, clearly show that Coppins expected much more than a confusingly weighted "average" of numerous factors, most of which more accurately relate to the property's market value. Coppins expected to be able to repair her late mother's property to a reasonable standard of livability. That is what the policy contemplates, and that should have been the focus of the appraiser. But that is not what happened in this case, and consequently we must set aside the erroneous award. *See Farmers*, 319 Wis. 2d 52, ¶ 50.

199

¶ 31.   Furthermore, Allstate's numerous citations to cases in which the "broad evidence rule" was used to calculate actual cash value are not persuasive under these circumstances. First, as is clear from our review of the policy and common definitions of "actual cash value," nothing in this policy would tip off an insured to the fact that "broad evidence," which in this case really meant market value, would be used to calculate the loss. If Allstate planned to focus on the property's market value to determine coverage, the policy should have clearly said so. Thus, relying on other cases where market value may have been incorporated into a policy begs the question of what a reasonable insured would have understood by reading this particular policy.[12] Second, many of the cases that Allstate cites for its contention that "broad evidence," and more specifically, market value, should be the primary focus of an actual cash value calculation are factually distinguishable. *See, e.g., Doelger & Kirsten, Inc. v. National Union Fire Ins. Co.*, 42 Wis. 2d 518, 521–25, 167 N.W.2d 198 (1969) (affirming trial court's use of "replacement cost, minus physical depreciation and minus obsolescence" to determine actual cash value "of wooden patterns of uncertain age, apparently more than 30 years old, last used in 1958 or 1959 and useable only for producing of castings for alligator shears," which are not "scissors to remove warts from crocodiles" but "an item of heavy industrial equipment for which there no longer seems to be much public demand"); *Strauss Bros. Packing Co. v. American Ins. Co.*, 98 Wis. 2d 706, 706–09, 298 N.W.2d 108 (1980) (even though "market value" was traditionally used to determine the actual cash value of livestock, in this case

---

[12] For this reason, we omit a detailed discussion of the numerous cases from outside jurisdictions that Allstate cites in its brief.

200

the market value of livestock slaughtered following a barn collapse was far less than it would have been if the livestock would have been slaughtered later in the season had the barn not collapsed, so additional evidence could be considered; in other words, "in determining the actual cash value of growing livestock, evidence of the value of full-term calves less the cost of care and feeding to the conclusion of the term is admissible and relevant under a broad evidence rule when a covered loss occurs and requires that calves be marketed before the completion of the term"); *Wisconsin Screw Co. v. Fireman's Fund Ins. Co.*, 297 F.2d 697, 699–701 (7th Cir. 1962) (trial court's use of "market value"—which was in effect the cost to replace equipment with used machinery—to calculate "actual cash value" of damaged manufacturing equipment was affirmed where "the nature of the property, the numerous and different categories of items involved, and the varying extent of damage" made "ascertainment of values and resulting loss a difficult task" and "[t]he amount of loss was not readily determinable"). All contain unique circumstances not present here, and none concern themselves with the calculation of actual cash value for a dwelling following a fire loss.

¶ 32.   In sum, the policy and standard definitions of actual cash value—including definitions set forth by the Wisconsin Office of the Commissioner of Insurance and Allstate's own website—contemplate that "actual cash value" would be calculated in the instant case primarily by subtracting depreciation from the cost to repair the damaged property. Because the appraiser essentially substituted market value for actual cash value, and because there is no basis in the policy for the appraiser's substitution, we conclude that the appraiser

did not understand his contractually assigned task and that the award must be set aside.

*B. Summary judgment must be denied because Allstate's actions create issues of fact for a jury concerning Coppins' claims.*

¶ 33. Having determined that the appraiser's award, which formed the basis for the trial court's grant of summary judgment, must be set aside, we turn next to the question of whether there are issues of fact precluding summary judgment on Coppins' claims against Allstate.

¶ 34. We conclude that summary judgment is inappropriate here. Coppins' claims for breach of contract, promissory estoppel, and bad faith all stem from the same alleged actions taken by Allstate. Coppins claims that Allstate entered into a contract with her deceased mother in which it calculated insurance coverage and the corresponding premium by one method —replacement value minus depreciation—but post-loss, valued the property by an entirely different method—market value—which resulted in significantly reduced coverage for the property. As we have already discussed at length, there is ample support in the record for this theory. In addition, there is factual support for Coppins' claim that Allstate deliberately misconstrued its policy in order to shirk its duties by hiring an incompetent appraiser, one who had no background in adjusting insurance claims, and instructing him to solely rely on market value.

¶ 35. While we will not rehash the facts in their entirety here, we will highlight those we find especially persuasive, including the fact that Allstate's first ap-

praiser, Van Caster, initially calculated the property's actual cash value at approximately $113,000, yet Allstate inexplicably rejected that value and insisted that a second appraiser value the property based on market value. Allstate then repeated its insistence on use of market value with subsequent appraisers, even though the policy said nothing about the use of market value to determine coverage and even though the terms of the policy, the nature of the policy, the amount of coverage purchased, and commonly accepted definitions of "actual cash value"—including the definition espoused in Allstate's own website—clearly demonstrate that Allstate should have paid for the replacement of the property minus depreciation or the policy limits (including the ten-percent upgrade to bring the dwelling up to current standards)—whichever sum was smaller. In sum, given the facts of record, a reasonable trier of fact could certainly conclude that Allstate: (1) breached the terms of its policy; (2) acted in bad faith; and (3) should be, as the complaint states, "estopped from disregarding the actual cash value declared in its policy declarations upon which its premium was based."

¶ 36.    Therefore, for all of the foregoing reasons, we set aside the award of the appraiser, reverse the trial court's order granting summary judgment to Allstate, and remand for proceedings not inconsistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.